based on Wilder's conduct in his declaration he said, quote, he felt it was in his best interest to not further try to resolve the grievance and as to Mr. Turner's point  I'm going to call on Miss Gambino to speak on behalf of the appellant. Give us one minute. Miss Gambino, can you turn off the stream, please? Yes, thank you. Thank you. We'll now move to appeal number 19-3388, United States v. Ethel Shelton. We're going to begin with the argument of the appellant, Miss Gambino. Good morning, Judge Brennan, Judge Flom, and Judge Rovner. I am appearing on behalf of Mrs. Ethel Shelton. There are two issues before the court today. First, that the district court erred in denying Miss Shelton's motion for mistrial. And secondly, that there was insufficient evidence at trial to support a finding of guilty on the charges of wire fraud and honest services fraud. So I'll begin with the motion for mistrial. In this particular case, the facts are largely undisputed. The legal conclusions are disputed. During the middle or the course of the trial, it turned out that Mr. Stanford Garbutt, the government's informant, had been told to collect documents from the office of Miss Shelton and various other places. And he went and did that before hours and at the direction of the FBI. This was a violation of Mrs. Shelton's Fourth Amendment right to be secure in her papers, in effect. It was a warrantless search. There's no dispute about that. There is also no dispute that there was no exception to the warrant requirement. The district court erred in focusing his decision on his determination that Miss Shelton lacked privacy in her workplace. And we believe and propose that this was a violation of Supreme Court law, starting with Mancusi versus DeForte, finding that privacy in the workplace is a right that's protected and recognized under the Fourth Amendment and further recognized more recently in Oliver versus the United States, saying that there are deep roots in our legal history which recognize this. And also in the court's decision in O'Connor v. Ortega, where workplace privacy is recognized. Now. Good evening, Ms. Scambino. At Record 234-7, the government presents the warrant application shorn of the information gained during Garbutt's warrantless searches. So my first question to you is whether you agree that this is an accurate representation of what remains after removing information from Garbutt's warrantless searches. Your Honor, I think it's a little bit more complicated in this case than simply removing that information. And the reason why this is so is that Mr. Garbutt was the heart and soul of their case. And basically, his tainting of all of the further evidence that was gathered by this illegal search went beyond just the mere introduction of the evidence. Because what was achieved by Mr. Garbutt's illegal search was not only evidence that was used to get the next warrant, as suggested, but also it gave the reassurance to the agent of his credibility and gave the agent a reason to go and then give him tape recording equipment to go make voice recordings and things of that nature. Would the remaining information not be enough? No, Your Honor. Of a warrant? Not with respect to Mrs. Shelton and her participation or with respect to the others, although I'm pretty narrowly focused here. If he had not been able, if he had not conducted his warrantless search, he would not have been given the recording equipment and he would not have been allowed to further develop the case. So I think that it's not just a matter of the material that was left, but also the question of his recordings and his credibility and the information that was initially seized. I think that if this had been handled properly, this is the second aspect of the motion to mistrial is the Brady Giulio violation. If this information had been turned over to the parties in advance of trial, then the motion to suppress could have been done and should have been done in order to determine whether any of that evidence would be admissible at trial. Ms. Gambino, when you're talking about that information or that evidence that should have been turned over pre-trial, what are you referring to? The information that the, first of all, that Mr. Garbutt was directed by the FBI to conduct a search before work hours of the office and the filing cabinets and the desk and the third room. And this is Elgin's room and this is Shelton's office. And that not only had he conducted this search, but he had seized documents from all of those places. Now, the information that was turned over prior to trial did not provide that information. It did not provide any times when this cooperating human source was supposedly was getting information. It demonstrated that the cooperating human source had provided information, but he didn't say how it was taken, where it was taken from, whether it was taken from permission or not permission, whether the FBI had directed him to do that. None of that was clear. But the wrongfully obtained documents didn't come in as evidence. The documents that did come in were gathered pursuant to a warrant, right? That's correct, Your Honor. The problem that I'm pointing out is that if there hadn't been a Brady violation and we had known in advance of trial that the informant was used as an agent to do an illegal search, we would have challenged it before trial. And we would have had the opportunity to try and suppress the rest of the information that did come in at trial. But we were not able to do that because we didn't find out about what happened until we were mid-trial. And once we were in the middle of the trial, there was no opportunity other than to ask for a mistrial, try to get the relief that we would have sought, which was that all the rest of that evidence was not legitimately obtained because it was based on this illegal activity in the first instance. So, Ms. Gambino, I'm trying to disaggregate what the defense would have known from receiving the discovery. They knew that there was a search, that documents were taken. That's different than the FBI agent on the stand being cross-examined and basically admitting that the search was unreasonable. I'm trying to reconcile those two areas of evidence. I can be helpful with that, Your Honor, because we didn't know from the discovery that we received that there had been a search. There were reports saying CHS gave X document to the FBI agent or CHS has this document that was originally located on Mrs. Shelton's desk. But there was nothing to indicate that he got these documents by way of an illegal search. There was no indication one way or another whether Mrs. Shelton had given him the documents, whether he was rightfully in possession of the documents, or whether he had been directed to take the documents. So, we didn't know there was an actual search. And we didn't know that the search that occurred was directed by the FBI because there was nothing in the original discovery to suggest that. And, of course, wouldn't have presumed that without some kind of report from the agent saying, as we usually get, 302, which outlines the dates and the times and the circumstances under which certain documents were taken. This kind of information was not provided to us in advance of trial. Thank you. So, it was not at all clear that we had a basis for doing a motion to suppress. And I believe that the district court recognized that in his order where he found that the information was not disclosed pre-trial as it should have been, even though there were, as he characterized, the kernels of information that were in the pre-trial discovery. So, the fundamental problem with the court's decision, because he recognizes all the crucial factors. He recognizes that there was a warrantless search. He said directly that he cannot help but note the open-ended scope of the informant's evidence hunt on the defendant's work desk. He found that Agent Holbrook directed his informant to conduct the warrantless and illegal search. He found that the information collected was used to support the warrant for the legal search and that the information was not disclosed pre-trial as it should have been. But he still came down and focused on whether or not Mrs. Shelton had a privacy right in her office. And we would suggest that under Supreme Court case law and under this court's case law, she did have a privacy right in her office. She was able to exclude people when she needed to work quietly. Her office was not a public space. Just as with the court's finding in O'Connor v. Ortega, where Dr. Ortega worked in a state hospital and had an office desk and filing cabinets, and there were many medical employees that came in and out of his office, but that didn't take away from the fact that he did have a right to privacy in his office as against law enforcement. I think that the privacy right in both the district court's decision and the government's brief conflates the right of privacy as an employee versus an employer as opposed to the privacy right that someone or anyone has against law enforcement. So, none of the evidence that was provided or taken would have been inevitably discovered or subject to any of the other limitations of the exclusionary rule, for instance, because it was Garbutt that started the investigation in the first place. This was not a case in which the FBI was looking at the Calumet Township office or the Calumet Township trustee until the informant presented himself and said, I have this information. Are you interested? And it went on from there. So, if you don't have any more questions on the question of mistrial, I would continue on to the sufficiency of the evidence. That's as fine as long as you know you're in your rebuttal time. In which case, Your Honor, I believe I will reserve my time and thank the court. Thank you, Ms. Gambino. Mr. Whalen, we'll move to you on behalf of the appellee of the government. May it please the court. I don't know whether to say good morning or good afternoon. I think we're right on the edge, but I'll go with good afternoon, Your Honors. My name is Nathaniel Whalen. I'm here on behalf of the United States of America. Your Honors, let's just jump into the Fourth Amendment issue. And I think the court has a lot of good questions about the independent source doctrine. But I do want to draw attention back to the reasonable expectation of privacy. And what's important in this case. Thank you, Mr. Whalen. I would really appreciate your letting us know if Agent Holbrook would have been able to do the things that he directed Garvin to do without a warrant. In other words, could Agent Holbrook have had access to Ms. Shelton's office and desks? Was her desk essentially open to the public? Yes, Your Honor. Agent Holbrook could have done what the agent did. I don't know that that's the end of the analysis because it is slightly more nuanced given that Garvin had the right to be there independent of what Holbrook would have done. But when we're talking about a reasonable expectation of privacy, Your Honors, the defendant has presented no evidence of any steps she took to retain these documents as private. And I do want to clear up one thing. We're not dealing with documents from a file cabinet. We're not dealing with documents from inside a desk. We're dealing with documents lying on the plain face of the desk. And that's what the district court found. And the defendants presented no evidence to the contrary. Yes, Judge Rovner, I'm sorry. Now, Garvin didn't collect these documents as a fellow employee. He took them as an agent of and at the direction of the FBI. That's true, Your Honor. And I don't I mean, the relevant privacy interest here is the one against government intrusion because Garvin is acting as an agent of the government, not as a co-worker. You know, when he's conducting these searches at Agent Holbrook's direction. That's true, Your Honor. And what the court looks at is whether the agent had a right to be where he was. Without a warrant? Without a warrant. That's correct, Your Honor. The point that we're trying to make in terms of the reasonable expectation of privacy as it relates to Garvin is that there's this relationship where Garvin is there on a regular basis. And he is there in her office at times when she's not there. And she knows this. This isn't some situation where the defendant locks her door. She marks the documents confidential. She puts them in the desk. She does something, anything to try. Forgive me, but Agent Holbrook admitted on the stand that Garvin was not conducting these searches as a fellow employee. He was conducting them as an agent of the FBI. So why does it matter that these things were in areas where Garvin could be because he was an employee? There's a disconnect for me. Yeah, and what I would say to that, Your Honor, is what the Jennings Court talked about. Just because you become a government agent doesn't mean you're restricted in where you can go. You know, when Garvin signs up as a governmental agent, that doesn't mean he can't go into Ms. Shelton's office anymore. He had to go in there. He had to go in there every day to sign his timesheets. If he was her supervisor, she testified, he was required by the employee handbook to go in there and to make sure that her desk is clean. You know, the point that we're trying to make in relation to that is she is letting him in there on a regular basis. It's almost a consent-type situation. To sign his timesheets, not to riffle through all her things. Could he have gone in her purse also? Sorry, could he have gone in where? Into her purse if it was sitting there? Well, Your Honor, under the employee handbook, he could have. The employee handbook does say that your personal items are subject to use. But I do think that… What? Well, if he's her supervisor, she contends, then yes, under the employee handbook, he is allowed to go in there. It's not as though he's exceeding his scope when he's in the office. My point is just that this is part of his job, as she's described it, to be in her office. I mean, I guess, Your Honor, the point that we're trying to make here is that it's her obligation to demonstrate that she had a reasonable expectation of privacy in the things on her desk. And it's not hard to put something in a file cabinet, to put it in a drawer, to mark it confidential. What Garbutt found on her desk was the stuff she's exposing to the public, Your Honor. I mean, we can go back to the Supreme Court case where you're in a phone booth and you're talking. There's nothing that prevents the government agent from standing right outside the phone booth and listening. Yes, her reasonable expectation of privacy is her expectation analyzed against intrusions by coworkers or against intrusions by law enforcement. Look, I understand that her employer could have searched her desk, her employer, or perhaps authorized law enforcement to search her desk. But that's not what happened here. Right, Your Honor, which again takes it back to the fact that she exhibited no expectation of privacy. There isn't a one-box expectation of privacy when we're talking about offices or places you work. You can't just say, yes, it's an office, and so you have an expectation of privacy in it. The Supreme Court has told us that in Ortega. What this is is a factual inquiry as to whether the defendant has exhibited any expectation of privacy. And the only time that's referenced during the first part of the argument is that defense says that Ms. Shelton was able to exclude people when she wanted to work quietly and privately. Your Honor, there's just no evidence of that. There isn't any evidence that she could exclude people. She did exclude people. She shut her door. She put things in the file cabinet. She marked it confidential. These are the simple steps she could have either done or testified to or somehow presented evidence that she did to keep these documents public or keep them private. And, you know, if Your Honor walks through Your Honor's chambers and you see something on top of your assistant's desk, I'm not sure that they do have an expectation of privacy to that. But that's different because Your Honors presumably lock your door. Your Honors presumably have a courthouse. I have to tell you, Mr. Whalen, I'm finding your argument quite shocking. I really am. Well, Your Honor, I think the question is I'm not suggesting that that is a situation that there's a one-size-fits-all. What under this court and the Supreme Court's precedent is the defendant has to explain what they did to keep the information private. And I've asked Your Honors to go through the record and figure out what information the defendant, what steps the defendant took to keep anything private. Mr. Whalen, do you want to comment on the remedy for allegedly unreasonable search? Is it Brady? Is it Giglio? Or is that a different path? Well, Your Honor, I guess it's a different path. Even if this court does believe that the search was unconstitutional, as Judge Rovner pointed out, there is the independent source doctrine. The independent source doctrine we believe is solid in this case, and it's the alternate holding the district court found. There is probable cause absent the references to things that Garbutt took in the warrant. And, Your Honor, I don't think it's ever been really disputed about the document we provided to the court shorn of that evidence. And so that's what the court found. We think, again, if there's an unlawful search, that that is the remedy is the evidence would still be admissible. As Judge Rovner pointed out, though, that we didn't introduce anything at trial. In terms of Your Honor's questions about any alleged Brady or Giglio violation, you know, Your Honor, if you go through document 234-5, we presented the summaries of each one of the pieces of evidence that Garbutt gave to the FBI, and this was presented to defense counsel. And it says the information was discovered on Shelton's desk. That's enough right there for her to be able to bring the suppression motion pretrial. But, you know, Your Honor, another point on that is, let's say even if this court agrees, even if we didn't provide every single fact that would have allowed her to make the suppression motion, the suppression motion was litigated. You know, there was no prejudice here because the defense got to argue the points that they did. They got a judgment on the merits in the suppression motion. And if the court had found that this was an illegal search, then they would have gotten a new trial. It's the same thing that would have happened had this happened pretrial, right? There would have been a suppression motion. And if the court agreed, we would have started over again, absent the illegally obtained evidence. Is the fact that the independent source doctrine is in play, is that why the good faith exception doesn't come into play here? Why wasn't good faith exception at some point raised? Yeah, Your Honor, I guess I'm at a little bit of a loss. Not at a loss. I guess I don't quite understand the court's question. Where the good faith exception usually applies is when we have a warrant. There obviously was a warrant in this case, but the defense is attacking the information gathered prior to the warrant. And so this isn't a case like Leon where we're able to say we had a warrant and we relied on it about the stuff prior to the initial search warrant. All right. But before your time elapses, Mr. Whalen, I wanted to speak a little bit about this wire fraud, honest services, count six. Sure. What I'm interested in is are there differences between, say, the paradigmatic example of wire fraud, honest services, like we see in a lot of the case law, and what happened here? I understand the argument that the bribery kickback component has been satisfied here as a result of what the employee was able to retain. But I'm wondering whether or not there's somehow a square peg going in a round hole here with regard to the fit between these facts and that particular crime alleged in count six. Your Honor, just to be clear, we're talking about the honest services fraud and not the wire fraud theory, right? Because they are two distinct theories. Well, I thought the way the judgment of conviction was written, it also included wire fraud as part of count six. Yeah. No, I just want to make sure because there's a separate wire fraud conspiracy. Not the initial, the second one. Yes. Yeah. So I guess if I understand Your Honor's question correctly, it's do the facts support the crime alleged in the indictment? Correct. Yeah. Your Honor, they do. There's evidence in this case that we've outlined in our brief that individuals who didn't kick back the money for the tickets were fired. And Ms. Lynch is the most discreet example or the most concrete example. She's hired in 12, fall of 2012. She doesn't buy tickets. The second go around, she hasn't bought the tickets. Now they start taking her access to the materials she needs to do her job away. She still doesn't play the game. She doesn't kick back and buy the tickets. And she's told, listen, make it right. And around in September of 2013 is when we're dealing with the transcript in the two-hour call in Exhibit 1. And so what the defendant says at that point, and the conspirators are lamenting the fact that there are no ramifications for individuals who can't or who won't pay to play. And so what the defendant says is they think they do their jobs and that's it. I had someone told me that. I do my job. You know, you look around, you're a person getting laid off, then they'll pay the ticket. They're still here, so they see that. Three months later, a co-conspirator fires Ms. Lynch. And he lets everyone else know, listen, the reason she's fired, she didn't buy the tickets. So the employees understood that they had to pay to play. They had to bribe their way to keep from getting fired. There are other examples of it, Your Honor. You know, there's individuals who testified they were not promoted, they believe, because they refused to buy the tickets. And under the sufficiency of the evidence standard, there was enough here for a reasonable juror to find that there was this conspiracy to force the employees to buy these tickets if they didn't want to be fired. I'd like to ask a different question. If an employee is essentially stealing time from an employer, where is the use of the wires in that crime? Did it matter for count one what she was doing with the stolen time? In other words, could she have been convicted of wire fraud for reading novels during work hours or taking long lunches? I ask because that count seemed like a backdoor to get around skilling. Well, Your Honor, sorry. There are a couple of questions in there. Let me make sure I answer them all. If I may, I see I'm out of time. With Your Honor's indulgence, I'll continue answering the question. That's fine. This is not a backdoor of skilling. What this is, this is the situation where the conspirators are turning employees of Township Time into essentially their political workers. And it's what the court talks about in Kelly. It's what this court talked about in Pabey. Pabey is the case where the supervisor has his employees painting his house. If Elgin and the conspirators weren't forcing these employees to be their political employees, essentially doing all this political work, they would have to go and pay someone else to do that. They are stealing the employees' time and forcing them to work on the political campaign. Now, Your Honor, in terms of whether or not, circling back to the first part of your question, whether or not that employee who sits and reads a book has committed wire fraud, I think it would depend on whether or not that's a fraudulent representation when they submit their timesheets that they have conducted only township work. I think if she does it for two hours, the employee, it's probably not a material misrepresentation with the intent to defraud. It's certainly not the ideal employee. What we have here, though, is we have the township saying you are only to do township work on township time. When the employees sign their paysheets, they're saying we have done only township work. And that's not true because they were being forced to do all this political work, including the campaign tickets, including preparing materials for the fundraisers and all the things that they were being forced to do on the township time. I just want to make sure I did answer Your Honor's question. Thank you. Thank you, Mr. Whalen. And thank you. Your time has expired. You know, we'll go back to you now for rebuttal. Thank you, Your Honor. With respect to the last question first, the United States, Kelly versus the United States specifically said that employee labor costs were not money and property for purposes of the wire fraud statute. And nobody was being forced or coerced to do anything. And in fact, in response to Judge Rovner, with respect to Mrs. Shelton, I do see this as a backdoor way charging her with wire fraud for supposedly doing campaign work on company time is the same thing as the conduct that is alleged in the supposed bribery kickback scheme. And in either case, did Mrs. Shelton agree to participate in fraud? And as to the privacy issue, she testified in Volume 8 that her office was not open to the public. The short answer to Your Honor's question about Agent Holbrook is that he could not have done what Garbutt did because he didn't have a warrant. Her office was on the third floor of a building and it had doors to close and it was a research. She was a pre in a pre area for Mary Elgin. So it wasn't the case that it was open to the public or that anybody who wasn't invited for government business could just wander in and take things. There is no good faith exception in this case because there was no warrant and that's that's the entirety of the problem. And there is no independent source because the whole rest of the evidence depended upon what Garbutt collated illegally in the first place. With respect to the honest services here, we have issues and not only because there's no deception involved, but I think if you're going to go down the road of calling campaign contributions, bribery and kickbacks, our whole political system is going to be in trouble. There was no evidence except for Ms. Lynch, who had personal problems with Stephen Hunter, that anybody else paid that didn't want to pay or was fired because they didn't pay. In fact, the two longest term employees who were testifying at trial said not only did they not pay, but they kept their jobs and they were in fact holdovers from the previous administration. So there wasn't a correlation between the firing. The firings were happening because money was being cut and they had to reduce the budget. So with that one exception and Ms. Lynch had nothing at all to do with Mrs. Shelton and testified to the same. So we would ask your honors in conclusion that the conviction be vacated based on insufficient evidence and in the alternative that it be remanded for a new trial based on the error and denying the motion for mistrial. Thank you, Ms. Gambino. Thank you, Mr. Whalen. Ms. Gambino, you've been appointed by the court. You go with the thanks of the court and thanks to both counsel and we'll take the case under advisement. Thank you. Thank you, Your Honor.